**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ANTONE THOMPSON, | § | |
|     PLAINTIFF | § | |
| | § | |
| V. | § | CIVIL ACTION NO: 4:25-CV-1123 |
| | § | |
| | § | JURY TRIAL DEMANDED |
| LOCKHEED MARTIN | § | |
| CORPORTATION | § | |
| | § | |
| | § | |
|     DEFENDANT. | | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND**

**TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:**

**NOW COMES** Plaintiff, Mr. Antone Thompson, by and through undersigned counsel,

Tully Rinckey, PLLC, and hereby states the following complaint against Defendant, Lockheed

Martin Corporation, (hereinafter "Defendant"), for the cause of action stated as follows:

## I.    NATURE OF THE CASE

1. Plaintiff Antone Thompson ("Plaintiff" or "Mr. Thompson") brings this action pursuant to

pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et.*

*seq*.; Americans with Disabilities Act of 1990 as Amended, 42 U.S.C. § 12101, *et. seq*.;

Civil Rights Act of 1871 as amended, 42 U.S.C. § 1981, *et seq*.; Uniformed Services

Employment and Reemployment Rights Act of 1994 ("USERRA"), under 38 U.S.C. §

4301, *et seq*.; Family and Medical Leave Act of 1993 ("FMLA"), under 29 U.S.C. § 2601,

*et seq*.; and the Age Discrimination in Employment Act of 1967, 29 USC §621, *et seq*. for

relief from discrimination; hostile work environment based on race, age, disability, sex,

and veteran status; and retaliation.

## II.    THE PARTIES

1

2. Plaintiff is domiciled in Argyle, Texas, which is in Denton County, a county in this District.

3. Defendant is Lockheed Martin Corporation, herein referred to as "Defendant" or "LM". LM is a for-profit corporation incorporated in Maryland, which has its headquarters at 6801 Rockledge Drive, Bethesda, MD 20817. LM is registered to do business in and throughout Texas. Defendant can be sued in Texas by serving Defendant's registered agent, Corporation Service Company DBA CSC - Lawyers INCO, at 211 E. 7TH Street, Suite 620, Austin, TX 78701.

4. Plaintiff worked for Defendant, LM. Plaintiff began full-time employment for the Defendant on or about October 29, 2012, until on or about April 4, 2024.

5. Defendant is a corporation that carries on regular business in Texas and has an office location in Lufkin, TX, which is in this District.

### III.    JURISDICITON AND VENUE

6. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, § 1332, §1367, and 42 U.S.C §§ 2000e-5, as it asserts a claim that arises under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et. seq.*, Americans with Disabilities Act of 1990 as Amended, 42 U.S.C. § 12101, *et. seq.*, USERRA under 38 U.S.C. § 4301, *et seq.*, Civil Rights Act of 1871 as amended, 42 U.S.C. § 1981, *et seq.*, and the Age Discrimination in Employment Act of 1967, 29 USC §621, *et. seq.*

7. This is an action for damages and for injunctive relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et. seq.* (hereinafter "Title VII") and is

within the jurisdiction of this Court pursuant to 38 U.S.C. §4323(b)(2) and 28 U.S.C. §1331.

8. This is also an action for damages and for injunctive relief pursuant to the Age Discrimination in Employment Act of 1967, 29 USC §621, *et seq.* (hereinafter "ADEA"), and is within the jurisdiction of this Court pursuant to 38 U.S.C. §4323(b)(2) and 28 U.S.C. §1331.

9. This is an action for damages and for injunctive relief pursuant to Americans with Disabilities Act of 1990 as Amended, 42 U.S.C. § 12101, *et. seq.* (hereinafter "ADA") and is within the jurisdiction of this Court pursuant to 38 U.S.C. §4323(b)(2) and 28 U.S.C. §1331.

10. This is an action for damages and for injunctive relief pursuant to Civil Rights Act of 1871 as amended, 42 U.S.C. § 1981, *et seq.* (hereinafter "CRA §1981") and is within the jurisdiction of this Court pursuant to 38 U.S.C. §4323(b)(2) and 28 U.S.C. §1331.

11. This is an action for damages and for injunctive relief pursuant to USERRA, 38 U.S.C. § 4301, *et seq.* (hereinafter "USERRA") and is within the jurisdiction of this Court pursuant to 38 U.S.C. §4323(b)(2) and 28 U.S.C. §1331.

12. This is an action for damages and for injunctive relief pursuant to Family and Medical Leave Act of 1993 ("FMLA"), under 29 U.S.C. § 2601, *et seq.* and is within the jurisdiction of this Court pursuant to 38 U.S.C. §4323(b)(2) and 28 U.S.C. §1331.

13. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

14. Venue is appropriate and based on the fact that a substantial part of the actions complained of are the result of actions and the employment practices of Defendant, an entity that

3

operates within the state of Texas, and which actions occurred within this judicial district. 28 U.S.C. § 1391.

15. Venue is further appropriate because a substantial part of the events or omissions giving rise to this Complaint occurred within this district.

## IV.   EXHUASTION OF REMEDIES

16. Plaintiff has exhausted all of his administrative remedies related to this case.  *See* Exhibit 1, Determination and Notice of Rights.

17. On October 1, 2024, Plaintiff timely filed a EEOC formal complaint Charge No. 450-2025-00031 against Defendant.

18. On July 14, 2025, the EEOC issued a determination to not proceed further with the investigation and made no findings on the merit for Charge No. 450-2025-00031. This determination also provided Plaintiff with his Notice of Right to Sue in Federal Court within ninety (90) days of receipt of the notice. *See* Exhibit 1, Notice of Right to Sue. Additionally, any deadline that falls on the weekend or federal holiday automatically gets extended to the next business day. *See* Fed. R. Civ. P. 6 (a), *et seq*. October 12, 2025, is a Sunday, and October 13, 2025, is Columbus Day, which is a federal holiday. *See* Exhibit 2, Federal Holidays 2025. Therefore, the deadline to file the complaint herein is October 14, 2025. *See* Fed. R. Civ. P. 6.

19. As such, Plaintiff timely files this action within ninety ("90") days of receipt of the Notice of Right to Sue of his EEOC charge, in conjunction with Fed. R. Civ. P. 6 (a), *et seq*.

20. This Complaint is therefore proper and timely.

## IV.   FACTS

21. Plaintiff is African American.

22. Defendant was aware the Plaintiff is African American no later than 2012.

23. Plaintiff is Black.

24. Defendant was aware the Plaintiff is Black no later than 2012.

25. Plaintiff was born in 1969.

26. Defendant was aware the Plaintiff was born in 1969 no later than 2012.

27. Plaintiff is 56 years old as of the filing of the complaint herein.

28. Plaintiff's sex is male.

29. Defendant was aware the Plaintiff is male no later than 2012.

30. Plaintiff has disabilities of Anxiety Disorder, PTSD, Major Depressive Disorder, and Pulmonary Sarcoidosis.

31. Plaintiff's disabilities substantially limited activities of daily living, including sleep, concentration, breathing, and mobility.

32. Plaintiff's disabilities are permanent.

33. Despite these disabilities, Plaintiff at all times was well-qualified for all positions he worked for Defendant and performed at or above expectations.

34. Plaintiff had disabilities, a record of disability, or was otherwise perceived as having a disability since 2012.

35. Defendant knew, perceived, and/or otherwise constructively knew that Plaintiff had at least one disability no later than 2012.

36. Plaintiff served in the US Air Force from 1988 through on or about October 30, 2012, when he was honorably discharged via retirement after reaching the rank of Master Sargeant.

37. Plaintiff worked as a safety officer, reaching the positions of Maintenance Section Chief

5

and Squad Safety Manager before retiring from the US Air Force in 2012.

38. During his military service, Plaintiff deployed in Saudi Arabia and Qatar as part of the Post-9/11 Conflict from 2003 through 2006.

.

39. Defendant knew at the time of hiring that Plaintiff was active military duty at the start of Plaintiff's employment with LM.

40. Defendant knew that Plaintiff was a veteran no later than 2012.

41. Plaintiff began working for Defendant on or about October 29, 2012, in Fort Worth, TX.

42. At the beginning of his tenure working for Defendant, Plaintiff started working as an Assembly Supervisor.

43. At all times during his tenure working for Defendant, Plaintiff was well-qualified for the position he was in.

44. Plaintiff earned a Bachelor of Science in Aeronautical Science and Management from Embry Riddle University in August 2012, with a triple minor in Aeronautical Management, Aviation Safety, and Airport Management.

45. Plaintiff also earned a Master's Degree in Aeronautical Science, Aeronautical Management, and Aviation Safety from Embry Riddle University in October 2019.

46. Plaintiff earned a Certified Manager license from Community College of the Air Force in September 2012.

47. Plaintiff earned a Top Secret Security Clearance (SCI) in 2011.

48. Plaintiff successfully completed an AFSO21 Green Belt Facilitators/LEAN Logistics Course in 2012.

49. Plaintiff received commendation for his great performance from in the beginning,

including an "Exceptionally Exceeded" rating for Plaintiff's 2014 End-Of-Year performance rating that was heavily based on the rating officials' personal opinions.

50. Because Plaintiff performed well in his role as an assembly supervisor, Defendant subsequently promoted Plaintiff to Completion Associate Manager in June 2015.

51. As a Completion Associate Manager, Plaintiff successfully carried out multiple duties including but not limited to: supervising and managing the interior completion of aircraft to include sub-assemblies, avionics, mechanics, and aircraft production sites; coordinating subordinate employee recruitment selection and training, performance assessment, work assignments, salary, and recognition/disciplinary actions; and providing direction to primarily hourly/non-exempt subordinates using established policies and precedents, and responsible for the execution of standard administrative team tasks.

52. However, soon after he received his promotion, Defendant subjected Plaintiff to a troubling pattern of discrimination, retaliation, and disparate treatment, culminating in Plaintiff's termination in April 2024.

53. In 2015, Plaintiff confronted a white supervisor named Christopher Riddle ("Mr. Riddle") over Mr. Riddle reportedly referring to Black supervisors including Plaintiff as "niggers."

54. After this confrontation, Mr. Riddle began to spread false rumors about Plaintiff surveilling his employees and destroying their aircraft work cards.

55. When Plaintiff further confronted Mr. Riddle about these additional rumors, Mr. Riddle reported Plaintiff's new complaints to management official outside of the complaint process and accused Plaintiff of starting the problems.

56. Instead of investigating Plaintiff's concerns regarding Mr. Riddle's conduct, Defendant

instead scolded Plaintiff for making trouble and told Plaintiff to cease doing so.

57. After being scolded by Defendant, Plaintiff further learned from hourly employee Ronald Pedraza (who is not Black) had an encounter with Mr. Riddle where Mr. Riddle was angry about Plaintiff and vented that Mr. Riddle was, "Tired of these niggers!"

58. Mr. Pedraza claimed that he lambasted Mr. Riddle for using derogatory language about Black people, but Mr. Pedraza still works for Defendant as Defendant never terminated him.

59. Later in 2015, Director Stephen Howes ("Mr. Howes") (who is white) began to supervise Plaintiff for Defendant.

60. On or about January 18, 2016 (which was Martin Luther King Jr. Day), Mr. Howes derided observing Martin Luther King Jr. ("MLK") Day during a production meeting because allegedly not enough hourly employees showed up for work to maximize aircraft assembly production.

61. At least one other Black co-worker, Mgr. Timothy B. Wells ("Mr. Wells"), was also in attendance when Mr. Howes made his derogatory comments about MLK Day, but stayed silent out of fear of retaliation.

62. To note, Mr. Wells was a high performer, but he never received the senior manager promotion he deserved due to discriminatory hiring practices and instead took a lateral transfer to Japan to get out of the work environment.

63. By comparison, at least two underachieving white employees (Senior Manager Orin Dexter and Senior Manager Dale Turnbull) were promoted over Mr. Wells and Plaintiff.

64. In 2017, Defendant assigned a salary employee, Jason Croy (white, younger than Plaintiff), to Plaintiff.

65. Plaintiff attempted to hold Mr. Croy accountable for misconduct and poor performance.

66. However, despite Mr. Croy's misconduct and poor performance being verified by Defendant, management for Defendant retaliated against Plaintiff.

67. In an email sent from Plaintiff to ethics senior manager Jenny Jackson ("Ms. Jackson") on November 8, 2017, Plaintiff recounted that, on November 2, 2017, Plaintiff had a meeting with Ms. Jackson concerning complaints against him by Mr. Croy and Supervisor Mr. Christopher S. Kennedy ("Mr. Kennedy") (who is white) after Plaintiff had attempted to report Mr. Croy's workplace misconduct.

68. Both Mr. Croy and Mr. Kennedy had brought multiple false accusations including: (1) women being harassed on the production floor, (2) salary employees allowing for represented employees to egress/ingress on the salary employees' badge, and (3) false accusations against Plaintiff alleging that Plaintiff directed specialists to submit erroneous seam validation data.

69. Mr. Croy and Mr. Kennedy also alleged concerns about Plaintiff's style of management, specifically alleging that its "too harsh", "harassing" or "targeting only certain individuals".

70. Plaintiff explained to Ms. Jackson that Mr. Croy and Mr. Kennedy are poor performers and have a history of negative behavior which required disciplinary action taken against them.

71. Plaintiff also explained that Mr. Croy and Mr. Kennedy made those reports because Plaintiff had been holding them accountable for their actions and had been attempting to correct their negative behaviors concerning such problems as: (1) attendance violations, (2) failure to learn their duties/responsibilities in a timely manner, (3) failure to follow

instructions and Lockheed and management directives, (4) disregard for supervisory authority, (5) labor time recording violations, (6) failure to work cohesively with other employees, etc.

72. Assigned to be supervised by Plaintiff in the beginning of 2017, Mr. Kennedy was a poor performer who Plaintiff needed to take actions on to correct the performance, but Senior Manager Ronald Porter and Manager Marty Skipper (who are both white) took umbrage with Plaintiff placing Mr. Kennedy on a performance development plan ("PDP") despite a PDP being necessary per the employer's policy and by directions from Plaintiff's supervisor, Mgr. Rick Parvin ("Mr. Parvin"), and Human Resources Business Partner (HRBP), Andrea Leatherberry ("Ms. Leatherberry").

73. On or about March 8, 2017, Plaintiff issued a PDP after Mr. Kennedy's repeated attendance violations, multiple failures related to job performance, and neglecting to carry out his aircraft manufacturing supervisor duties and responsibilities.

74. Right after the issuance of the PDP to Mr. Kennedy, Mr. Porter and Mr. Skipper targeted Plaintiff by closing out Mr. Kennedy's PDP without following proper procedure and then advising Mr. Kennedy to file a complaint against Plaintiff through Ethics, even though Mr. Kennedy's complaint was found to be unsubstantiated.

75. Mr. Kennedy spent approximately the next 4 months starting on first shift where he was supposed to receive job training and then report to Plaintiff on 2nd shift, but when Mr. Kennedy reported back to Plaintiff during this period from March 2017 through July 2017, Plaintiff quickly observed that Mr. Kennedy did not know much of anything concerning how to do his job or use certain computer programs that are vital to performing his supervisory duties and responsibilities.

10

76. Mr. Kennedy knew very little about shop floor management ("SFM"), which was the primary aircraft build operations platform that contained all assembly task cards that was mandatory for all supervisors to use.

77. On or about March 17, 2017, Plaintiff had to teach Mr. Kennedy the very basics of SFM functions just so he could even begin to do his job.

78. Although Mr. Kennedy already had user accounts for other work platforms, Plaintiff saw on or about March 21, 2017, that Mr. Kennedy had never logged on and did not know how to use any of them including JSF Digital Library ("JDL").

79. On or about April 25, 2017, Plaintiff notified Mr. Kennedy that Plaintiff received several complaints almost daily one of Mr. Kennedy's employees allegedly abusing overtime and that Mr. Kennedy needed to have a conversation with the alleged employee about the claimed misconduct and monitor the employee's production levels.

80. Unfortunately, Mr. Kennedy incorrectly informed the particular employee that the employee was the only one not allowed to work weekday overtime, which was then reported to the union and then subsequently fixed by Plaintiff.

81. On or about May 8, 2017, Mr. Kennedy became confrontational with Plaintiff during the routine aircraft assembly line move.

82. Mr. Kennedy alleged that he felt like he was being watched or "bird-dogged" by Plaintiff, after Plaintiff sent Mr. Kennedy a series of emails and text messages asking Mr. Kennedy to correct his violations and a collection of overdue disciplinary documentation concerning multiple hourly, poor performing employees that fell under Mr. Kennedy's, including an employee who was caught sleeping in the production area by Plaintiff.

83. Additionally, Plaintiff notified Mr. Kennedy that Mr. Kennedy frequently spent too much

work time on personal phone calls and that Mr. Kennedy needed to stop bringing straw drinking cups and open soda cans in the production areas after Mr. Kennedy violated the policy prohibiting such items on multiple occasions.

84. Mr. Kennedy also did not show much initiative even after being issued the PDP despite that being an expectation for a supervisor, stating to Plaintiff instead that "mechanics should be able to get whatever they need to do their job on their own."

85. Starting in 2018 and continuing throughout his tenure working for Defendant, Plaintiff was the victim of "set-up" interviews as part of the discrimination and retaliation that prevented Plaintiff from being promoted to Manager.

86. Plaintiff had more than ten interviews with Defendant each for a promotion, but Defendant never allowed Plaintiff to be promoted beyond the level of Associate Manager, despite him outperforming and being more qualified than similarly situated younger, white co-workers while those same co-workers were promoted above Plaintiff.

87. To add, some of the white employees who were promoted over Plaintiff had one or multiple disciplinary actions in their personnel records, while Plaintiff's record was spotless and covered more years of experience.

88. For example, Mr. Skipper (white, younger) received two promotions within two years from Mr. Porter despite being written up and counseled by supervisor Mr. Timothy Wells ("Mr. Wells") before each of those promotions.

89. Plaintiff, on the other hand, was more qualified than Mr. Skipper for the positions that Mr. Skipper had been promoted to at each time of Mr. Skipper's promotions and had a clean personnel file compared to the counseling that Mr. Skipper received.

90. Another example of a white, younger employee that received promotions over Plaintiff

includes a co-worker by the name of Ronnie Webb ("Mr. Webb").

91. Mr. Webb was white and younger than Plaintiff.

92. In or around 2020, Defendant swapped Plaintiff with Mr. Webb onto the fast track to promotion as a EMAS L-5 Manager.

93. At the time of the swap, Plaintiff had more experience than Mr. Webb as Mr. Webb had only been a E-1 Mfg. Support Team Member Associate three-to-five years prior, while Plaintiff had eight years of supervisory experience by the time of the swap.

94. When Mr. McCorkel initially started working in EMAS, Mr. McCorkel was hired ahead of Plaintiff, as Plaintiff was an L-4 Associate Manager while Mr. McCorkel was appointed as Plaintiff's supervisor.

95. With Mr. McCorkel, Plaintiff was once again passed over for a less qualified white co-worker, as Plaintiff trained McCorkel on Mr. McCorkel's duties.

96. Additionally, some of these white employees also had performance improvement plans on file due to poor performance, which Plaintiff did not have.

97. In 2018, HRBP Terri Pitts ("Ms. Pitts") requested that Plaintiff send Ms. Pitts his statements concerning Mr. Croy's negative behaviors, only for Ms. Pitts to complain to Mr. Porter that Plaintiff was sending her documentation that she did not need.

98. Soon after, Ms. Pitts further embarrassed and humiliated Plaintiff during a job interview when Ms. Pitts, who was on the interview board, interrupted Plaintiff's attempts to respond to interview questions several times and berated him for allegedly taking too long to get to his points.

99. For the entire interview, Ms. Pitts was rude and condescending, and no one else on the interview board, which included Senior Manager Derrick Turner and then Senior

13

Manager Christopher Baker (both of whom are white and male), intervened.

100.    Additionally, Mr. Baker showed little interest in being at the interview as he arrived late, showed little interest, and then left early.

101.    Also in 2018, Senior Manager Ronald Porter used Senior Manager Ayeshanill Spring ("Ms. Spring") to target Plaintiff for discriminatory and retaliatory reasons.

102.    Ms. Spring also had been promoted to Senior Manager instead of Plaintiff despite Plaintiff being more experienced and qualified for the Senior Manager position.

103.    Mr. Porter and Ms. Spring put Plaintiff in charge of the entire J850 assembly line on 2nd shift, but despite his superior performance, Spring and Porter twice promoted Mr. Dale Turnbull ("Mr. Turnbull"), who is white, over Plaintiff despite Mr. Turnbull being a substantially worse performer than Plaintiff.

104.    Mr. Turnbull is now a Senior Manager and bragged to Plaintiff that Mr. Robert Fitzpatrick ("Mr. Fitzpatrick") (who is white) also helped ensure Mr. Turnbull kept getting promoted.

105.    Mr. Turnbull also told Plaintiff that the L5 manager position was promised to Mr. Turnbull instead of Plaintiff, including a text message telling Plaintiff that Mr. Turnbull that Mr. Turnbull got the job.

106.    Even though Plaintiff gave a good interview to the hiring officials of Mr. Fitzpatrick, Manager Robert J. Mosley ("Mr. Mosley"), and Manager Ty Ellery ("Mr. Ellery"), all of whom are white, Mr. Turnbull did receive the promotion to L5 manager.

107.    Plaintiff, meanwhile, never got promoted above Associate Manager in his nearly twelve-year tenure working for Defendant.

108.    Plaintiff became qualified for a promotion from L-4 Associate Manager to L-5

14

Manager in 2018, which would have resulted in a raise of $15,000-$20,000 per year.

109.     Whenever Plaintiff brought up his lack of promotion, Plaintiff's managers dismissed Plaintiff's concerns and even criticized Plaintiff for his military service.

110.      For example, when Mr. Scott Palmer ("Mr. Palmer") became Plaintiff's manager in the spring of 2019, Mr. Palmer immediately began to dismiss Plaintiff's concerns about disparate treatment and lack of promotion and raise.

111.     When Plaintiff verbally talked with Mr. Palmer in the summer of 2019 and requested a raise and an explanation as to why Plaintiff had not been promoted above Associate Manager, Mr. Palmer responded, "Why do you need a raise or promotion when you're already getting retirement and disability pay from your military service?"

112.     Additionally, co-workers like manager Steve Davis ("Mr. Davis") warned Plaintiff that Mr. Palmer did not like Plaintiff even before Mr. Palmer became Plaintiff's manager, alleging that Mr. Palmer does not like Plaintiff because of some old grudge against Plaintiff regarding Plaintiff's uniformed service and the benefits associated with the uniformed service.

113.     After the summer of 2019, Mr. Palmer afterwards avoided speaking with Plaintiff outside of snide remarks, including incredulously asking Plaintiff, "How the hell did you get a 3 diamonds on your security clearance badge?" After Plaintiff explained that Plaintiff had earned my Top Secret/SCI clearance in the Air Force, Mr. Palmer shook his head disapprovingly and said, "Geesh!"

114.     Plaintiff continued to be placed in pretextual "set up" interviews where white managers like two that he had with Mr. Palmer, Mr. Drew Brooks ("Mr. Brooks"), and Mr. Orin Dexter ("Mr. Dexter") where, despite Mr. Palmer telling Plaintiff he did a good

15

job in the interview, Plaintiff never received the recommendation for promotion.

115.    Despite the shenanigans going on, Plaintiff worked diligently to perform well and still received recognition because of how objectively well Plaintiff performed.

116.    Plaintiff, from 2019 through November 2023, also requested on multiple occasions for medical leave through FMLA due to Plaintiff's disabilities, including flare-ups of Plaintiff's autoimmune disease, pulmonary sarcoidosis, body inflammation, fluid in lung cavities, shortness of breath, joint pain, bouts of major depression, insomnia, and ulcers.

117.    From 2019 through November 2023, Plaintiff requested FMLA leave multiple time by contacting Sedgwick (the designated benefits administrator for Defendant) and notifying Plaintiff's direct supervisor in advance that Plaintiff needed to take FMLA leave.

118.    Again, Mr. Palmer, along with Mr. Dexter and Mr. Brooks, also disparaged Plaintiff's use of FMLA leave from 2019 through 2021, including complaining about Plaintiff's FMLA leave and sending emails to Plaintiff accusing Plaintiff of not being authorized to take FMLA leave despite Plaintiff receiving authorization.

119.     From 2018 through 2021, Plaintiff learned that Mr. Palmer, Mr. Dexter, and Mr. Brooks openly talked about how they never wanted to promote Plaintiff to L-5 Manager because of Plaintiff's uniformed service and use of FMLA.

120.    On April 21, 2023, Plaintiff received the highest individual combo award (Encore Award) available, and Plaintiff received an outstanding end-of-year review for 2023 in March 2024 on paper from his supervisor, F-35 EMAS Aircraft Assembly Dept. Director James Thistle ("Mr. Thistle") (who was white).

16

121.    However, Plaintiff was still somehow not worthy of the highest available raise or a well-deserved promotion.

122.    Again, Mr. Porter (white) promoted embattled associate manager Mr. Skipper (white) twice within a span of approximately 2 years.

123.    Mr. Skipper was on the verge of being terminated by his African-American Manager Mr. Wells, but Mr. Porter saved Mr. Skipper by getting Mr. Skipper out of trouble and taking over supervision of Mr. Skipper, an action that even the most stellar employee of color was typically not afforded.

124.    Because of Mr. Porter's intervention, Mr. Skipper reached senior manager but soon retired because he continued to struggle with carrying out his basic daily duties and responsibilities.

125.    Still, Plaintiff overheard Mr. Porter say to Mr. Parvin, "I can promote whoever I want whenever I want!"

126.    Mr. Parvin, who is white, was shunned by both Mr. Porter and Mr. Skipper for being a witness to the discrimination towards Plaintiff and speaking out against the discrimination.

127.    Starting in 2021 and lasting through Plaintiff's termination in 2024, Senior Manager Christopher Copen ("Mr. Copen") (white) further exacerbated the hostile work environment in the F-35 EMAS Assembly Department where Plaintiff worked, causing Plaintiff and multiple other people in positions of leadership to complain about Mr. Copen but to no avail.

128.    Mr. Copen, over multiple years, harassed and created a notorious hostile work environment for various employees (including Plaintiff) that was so severe and pervasive

that multiple employee leaders complained about Mr. Copen.

129.    The list of leaders who complained about Mr. Copen includes:  Director James Thistle, Senior Manager Tracy Auldridge, Manager Thomas "Drew" Brooks, Manager Scott Palmer, Manager Robert "Bobby" McCorkel, Associate Manager Michael Green, Associate Manager Brandon Mills, Senior Staff Specialist John "Greg" Burt, Associate Manager Vincent Koscielniak, Supervisor Pon Pimsorn, Senior Specialist Samantha Garton, and Union Steward Anthony Melchor.

130.    Additionally, Mr. Copen texted Plaintiff on multiple occasions from 2021 through 2024 telling Plaintiff that Plaintiff was out of place doing Plaintiff's actual assigned job, which is heavily racist and discriminatory.

131.    Mr. Copen spread lies about Plaintiff, which Mr. Thistle told Plaintiff about during standing Monday morning weekly Tag-Up meetings.

132.    Mr. Thistle was the direct supervisor for Plaintiff and Mr. Copen.

133.    Plaintiff was a consistent victim of Mr. Copen's harassment which had a racist, bigoted tone, but Mr. Thistle avoided approaching the issue and left efforts of finding resolution up to Plaintiff to handle on his own, which Mr. Copen had absolutely no interest constructively helping with.

134.    Mr. Copen was consistently one of the leading instigators of the hostile work environment.

135.    Over Plaintiff's final two years working for Defendant, Mr. Copen served as the common connector for all instances of harassment and hostile work environment as witnessed by Senior Manager Tracy Auldridge, Manager Thomas "Drew" Brooks, Manager Scott Palmer, Manager Bobby McCorkel, Senior Staff Manager John "Greg"

18

Burt, Deputy Director James Thistle, and other employees serving as associate managers, support team members or union representatives.

136.    Plaintiff and the mentioned witnesses complained about Mr. Copen's bullying, harassment, and intimidation to Defendant's Human Resources and Ethics representatives, but no apparent resulting actions taken against him.

137.    Additionally, Mr. Copen went to Mr. Thistle to lie about Plaintiff "hiding in vacant office spaces to sleep on the job" or alleged that Plaintiff was not involving Mr. Copen in process actions to improve aircraft foreign object damage awareness, with all allegations shown to be false.

138.    Mr. Copen attempted numerous times to worsen Plaintiff's record and get Plaintiff into trouble, to the point that even Mr. Thistle grew tired of Mr. Copen's negative behavior and confided to Plaintiff in private that Mr. Thistle did not believe Mr. Copen's false stories about Plaintiff because of the positive results that Plaintiff produced.

139.    Mr. Thistle further told Plaintiff multiple times in person and via text that Plaintiff was doing a "[r]emarkable job!"

140.    Then in March 2024, Plaintiff packed up his wife's car, including his handgun, as they drove out of town for her birthday within the United States.

141.    Plaintiff possessed at the time (and still today) a current TX conceal carry license and was allowed to carry the gun throughout the trip.

142.    After the trip, Plaintiff unloaded baggage from his wife's car, and Plaintiff also took his handgun out of his wife's car and stowed it in the map holder that's attached to the back of the passenger seat of his pickup truck and went to the grocery store immediately upon their return on or about March 11, 2024.

19

143.    As Plaintiff was tired from over ten hours of driving and pondering his plans to go back to work the very next morning and resume engagement with a highly stressful organizational manufacturing/process problem that he was picked to be the lead employee on, Plaintiff forgot about the gun that he left in his pickup truck.

144.    Plaintiff made a human error and did not remember to finally take his handgun back into the house to put it away.

145.    Unfortunately, Plaintiff ended up reporting to work on March 12, 2024, with his handgun still in his truck while parked on Defendant's property.

146.    Plaintiff drove home from work that evening, and upon his arrival, Plaintiff still genuinely did not remember to remove his handgun from his truck.

147.    Plaintiff and his wife then came down with the flu-symptoms the next day, but were negative for Covid, which still caused great concern for both as both are at risk from autoimmune diseases like pulmonary sarcoidosis for which Plaintiff receives veterans' disability compensation for, and his wife has lupus.

148.    At least as of March 2024, Defendant was aware that Plaintiff receives veterans' disability compensation for his pulmonary sarcoidosis as Plaintiff had disclosed the compensation to them while notifying them of his pulmonary sarcoidosis.

149.    Plaintiff sent a text to senior manager Tracy Auldridge and Senior Staff Support Team manager Greg Burt, to let them know that Plaintiff could not report to work, as Plaintiff's direct supervisor, Director James Thistle, was on vacation and was not the point of contact that day.

150.    When Plaintiff felt well enough to go back to work, Plaintiff still felt a brain fog due to the flu and forgot to remove his gun.

151.	Plaintiff again texted Tracy Auldridge and Greg Burt to let them know Plaintiff was going to a doctor's appointment for treatment for Plaintiff's pulmonary sarcoidosis.

152.	On March 14, 2024, Plaintiff had an infusion rheumatology appointment for his pulmonary sarcoidosis and then went to work that afternoon.

153.	Unfortunately, when Plaintiff arrived at work, Defendant's Security Captain Gonzales stopped outside Plaintiff's truck with an explosives K9, and Captain Gonzales asked Plaintiff if there was anything in his truck that he should be aware of.

154.	Plaintiff then remembered his handgun was still in his truck on company property, and to be honest and compliant per the Defendant's code of conduct, Plaintiff admitted to Captain Gonzales that his handgun was in his truck, including where exactly where the gun was.

155.	Plaintiff apologized for the incident and cooperated with the investigation as he had never been in any type of situation that could potentially harm or end his career.

156.	The incident was especially embarrassing because Plaintiff had finally been recognized as a "High Performer" as deemed by his direct supervisor for taking command of his department's failing FOD Prevention Program and improving the program to a point where Executive Leaders were extremely proud of.

157.	Plaintiff had disclosed his disabilities of Anxiety Disorder, PTSD, Major Depressive Disorder, and Pulmonary Sarcoidosis.

158.	These disabilities substantially limit Plaintiff's daily activities of breathing, thinking, immune system, concentrating, and sleeping.

159.	On April 4, 2024, Defendant terminated Plaintiff, on the basis that Plaintiff had violated the "gun safety and deadly weapon" policy.

160.    However, Defendant disparately enforced the policy cited for terminating Plaintiff.

161.    Specifically, Defendant had a direct comparator in L-6 Senior Manager Brian De Bree ("Mr. De Bree"), a white co-worker who was younger than Plaintiff.

162.    Mr. De Bree, a similarly situated employee was arrested and booked into jail in Parker County, TX for aggravated assault with a weapon.

163.    Mr. Debree violated Defendant's company policy sub-section 7.2 Violence, Threats or Harassment where the policy states in the Employee Handbook: "Committing on-or off-site acts of violence, assault, fighting, brawling or threatening another person with a weapon."

164.    However, Defendant allowed Mr. De Bree to return to work and did not terminate Mr. De Bree because of the arrest and violation of the cited weapons policy.

165.    Defendant, through its Human Resources, Executives, Senior Leaders, and other management officials, were well aware of Mr. De Bree's arrest incident.

166.    However, Defendant chose not to fire Mr. De Bree for the violent incident.

167.    Mr. De Bree was also less qualified than when compared to Plaintiff and some of Mr. De Bree's minority peers and lower level L-4 and L-5 Managers.

168.    Not only was Mr. De Bree less qualified and competent than Plaintiff, Mr. De Bree had been arrested for assault with a deadly weapon and booked for a felony.

169.    Yet Mr. De Bree, who was working for Defendant at the time of the arrest, was not fired for that incident.

170.    Plaintiff, by comparison, did not get arrested or even cause a public incident, but Defendant still chose to terminate him despite Plaintiff's conduct being less sever than

Mr. De Bree.

171. To top it off, Defendant has even reversed terminations of white employees who had broken the same firearms policy that Plaintiff was terminated for.

172. Daryl Dumas (who is white and younger than Plaintiff) was hired back by Defendant no later than October 29, 2024, after initially being terminated earlier in 2024.

173. During the entirety of the relevant time period, Plaintiff felt excluded and ostracized. Plaintiff's supervisors, specifically Mr. Copen, Mr. Kennedy, and Mr. Riddle, singled Plaintiff out, made him feel bullied and discriminated against, and facilitated a hostile work environment, hurling insults and racial slurs at Plaintiff and making up lies about Plaintiff's performance as well.

174. Plaintiff felt abused and harassed and has undergone tremendous emotional, mental, and physical anguish during the course of the aforementioned events.

175. The unaddressed practice of discriminatory and retaliatory behavior and disparate treatment Plaintiff suffered because of Defendant significantly affected his ability to perform his job, denied opportunities, had his future advancement with Defendant effectively denied, and ultimately led to Plaintiff being wrongfully terminated for a policy that others outside Plaintiff's protected classes were not similarly punished for.

176. As a US Air Force veteran, Plaintiff conducted service in the Uniformed Services under USERRA.

177. Plaintiff qualified as a protected employee under USERRA from at least April 4, 2022, through April 4, 2024.

178. Defendant qualifies as an employer covered by USERRA since at least April 4, 2022.

179.     Plaintiff had been an employee of Defendant for at least 12 months as of at least April 4, 2022.

180.     Plaintiff had at least 1,250 hours of service with Defendant, during the 12 months before his FMLA leave would have started if he had taken it on April 4, 2024.

181.     Plaintiff worked at Defendant's facility in Fort Worth, TX.

182.     Plaintiff worked at the Fort Worth facility from at least June 1, 2021, through April 4, 2024.

183.     The Fort Worth facility for Defendant has at least 50 employees within 75 miles since at least June 1, 2021.

184.     Defendant is an employer covered by the FMLA.

185.     Plaintiff qualifies as an employee covered by the FMLA.

186.     From January 2016 through Plaintiff's separation on or about April 4, 2024, Defendant subjected Plaintiff to a hostile work environment on the basis of Plaintiff's race, age, sex, and disability.

187.     Defendant, through multiple management officials, harassed Plaintiff through multiple derogatory comments and disparate treatment because of Plaintiff's race, including use of the term "nigger" when referring Plaintiff and other Black employees working for Defendant.

188.     The instances of derogatory remarks and adverse, disparate actions from January 2016 through April 2024 were severe and pervasive.

189.     On multiple occasions from January 2016 through April 2024, Plaintiff, both verbally and through email, notified authorized representatives for Defendant, including Mr. Howes, Mr. Kennedy, Ms. Jackson, Mr. Parvin, Mr. Thistle, and others, about the

unwelcome conduct, yet Defendant took no action to adequately address Plaintiff's complaints.

190.    From January 2016 through April 2024, Defendant also treated Plaintiff worse than similarly situated, less qualified employees who did not share Plaintiff's race, including but not limited to Mr. De Bree, Mr. Croy, Mr. Skipper, and Mr. Copen.

191.    Because of Plaintiff's race, Defendant subjected Plaintiff to a hostile work environment.

192.    Defendant, through multiple management officials, subjected Plaintiff to harassment and disparate treatment because of Plaintiff's age, including but not limited to termination and promoting multiple younger employees instead of Plaintiff despite Plaintiff being more qualified than the selectees on multiple occasions.

193.    The instances of disparate treatment from January 2016 through April 2024 were severe and pervasive.

194.    On multiple occasions from January 2016 through April 2024, Plaintiff, both verbally and through email, notified authorized representatives for Defendant, including Mr. Howes, Mr. Kennedy, Ms. Jackson, Mr. Parvin, Mr. Thistle, and others, about the unwelcome conduct, yet Defendant took no action to adequately address Plaintiff's complaints.

195.    From January 2016 through April 2024, Defendant also treated Plaintiff worse than similarly situated, less qualified employees who were younger than Plaintiff at all relevant times, including but not limited to Mr. Riddle, Mr. De Bree, Mr. Croy, Mr. Skipper, and Mr. Copen.

196.    From January 2016 through April 2024, Plaintiff has been over 40 years old,

25

which Defendant knew at all relevant times.

197.    Because of Plaintiff's age, Defendant subjected Plaintiff to a hostile work environment.

198.    Defendant, through multiple management officials, subjected Plaintiff to harassment and disparate treatment because of Plaintiff's disabilities, including but not limited to termination, denial of accommodation, and promoting multiple employees who did not have Plaintiff's disabilities instead of Plaintiff despite Plaintiff being more qualified than the selectees on multiple occasions.

199.    The instances of disparate treatment from January 2016 through April 2024 were severe and pervasive.

200.    On multiple occasions from January 2016 through April 2024, Plaintiff, both verbally and through email, notified authorized representatives for Defendant, including Mr. Howes, Mr. Kennedy, Ms. Jackson, Mr. Parvin, Mr. Thistle, and others, about the unwelcome conduct, yet Defendant took no action to adequately address Plaintiff's complaints.

201.    From January 2016 through April 2024, Defendant also treated Plaintiff worse than similarly situated, less qualified employees who did not have the same disabilities as had, including but not limited to Mr. Riddle, Mr. De Bree, Mr. Croy, Mr. Skipper, and Mr. Copen.

202.    From January 2016 through April 2024, Plaintiff had disabilities that substantially limited tasks of daily activities but did not prevent Plaintiff from being well-qualified at all times and perform his duties at or above expectations.

203.    Because of Plaintiff's disability, Defendant subjected Plaintiff to a hostile work

environment.

204.    Defendant, through multiple management officials, subjected Plaintiff to harassment and disparate treatment because of Plaintiff's sex, including but not limited to subjecting Plaintiff to harassing statements during promotion interviews and promoting a female employee instead of Plaintiff despite Plaintiff being more qualified than the selectees on multiple occasions.

205.    The instances of disparate treatment from January 2016 through April 2024 were severe and pervasive.

206.    On multiple occasions from January 2016 through April 2024, Plaintiff, both verbally and through email, notified authorized representatives for Defendant, including Mr. Howes, Mr. Kennedy, Ms. Jackson, Mr. Parvin, Mr. Thistle, and others, about the unwelcome conduct, yet Defendant took no action to adequately address Plaintiff's complaints.

207.    From January 2016 through April 2024, Defendant also treated Plaintiff worse than similarly situated, less qualified employees who did not share Plaintiff's sex, including Ms. Spring.

208.    Because of Plaintiff's sex, Defendant subjected Plaintiff to a hostile work environment.

209.    Defendant retaliated against Plaintiff because of Plaintiff's protected activity opposing discrimination and hostile work environment on the basis of race, sex, age, disability, use of FMLA leave, and Plaintiff's uniformed service.

210.    From January 2016 through April 2024, Plaintiff complained to Defendant's authorized representatives about disparate treatment when compared to similarly situated

employees who were treated more favorably than Plaintiff and did not share Plaintiff's protected bases of race, sex, age, and disabilities, including but not limited to promotions, raises, reasonable accommodations, and hostile work environment.

211.    From January 2016 through April 2024, Plaintiff also specifically complained to Defendant's authorized representatives about derogatory language used to refer to Black employees, including the term "nigger".

212.    From January 2016 through April 2024, Plaintiff received multiple adverse actions including but not limited to non-promotions, denied raises, harassment through derogatory remarks and statements interfering with Plaintiff's job duties, and ultimately termination.

213.    Additionally, Plaintiff disclosed his active-duty status upon during the hiring process in 2012, which would later be used against him from 2018 through 2021 to justify not promoting Plaintiff.

214.    Plaintiff also made requests for FMLA leave from 2019 through November 2023, which Plaintiff learned was also used against him to justify not promoting Plaintiff from 2019 through 2021.

## V.    CAUSES OF ACTION

### COUNT ONE

**(Discrimination on the Basis of Race in violation of Title VII, 42 U.S.C., § 2000e, *et seq.*)**

215.    Plaintiff incorporates all information and allegations made in Paragraphs 1-214 herein.

216.    Title VII, 42 U.S.C. §2000e, *inter alia*, protects employees from employment discrimination on the basis of race.

28

217.     Defendant, by and through its agents and employees, intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by Title VII (42 U.S.C §§ 2000e, *et seq.*) subjected Plaintiff to disparate treatment because of his race.

218.     Plaintiff was regarded by Defendant as being Black/African American since 2012.

219.     Plaintiff was a qualified individual for each position he held and applied for since October 2012.

220.     From January 2016 through April 2024, Defendant engaged in improper adverse actions that materially affected the terms, privileges, and conditions of Plaintiff's employment as it hindered the Plaintiff from seeking a promotion, increased salary, and obtaining other related promotional opportunities that were instead given to others that were not the same race as Plaintiff.

221.     Defendant also discriminated against Plaintiff by terminating him based on his race as a Black/African American person.

222.     Had Plaintiff been Black/African American, he would not have been forced to deal with the discriminatory conduct and been terminated.

223.     Because of his race, Plaintiff was disparately treated and subjected to the unlawful conduct and adverse actions alleged throughout this Complaint, including his repeated non-selections and non-promotions, racist and harassing comments directed at Plaintiff, fraudulent letters of counseling, and ultimately termination of Plaintiff.

224.     Defendant knew that Plaintiff is Black/African American prior to subjecting Plaintiff to the aforementioned material adverse employment actions, including terminating Plaintiff.

225.     The reasons proffered by Defendant for its unlawful conduct are pretextual, and

29

Defendant cannot further offer any legitimate reason for its unlawful conduct.

226.    The Defendant has failed to provide an actionable basis as to why he was not treated as favorably as other employees who did not share the same race as Plaintiff. Defendant instead cherry-picked their provided comparator evidence in their Position Statement and gave a pretextual explanation as to why Plaintiff was terminated to cover up for the discriminatory and retaliatory animus.

227.    Other employees, who did not share Plaintiff's race, were treated more favorably than Plaintiff in terms and conditions of employment and Plaintiff's termination.

228.    As a direct and proximate result of the aforementioned acts that violated Title VII, Plaintiff has suffered loss of wages, both in the past, present, and future, as well as compensatory damages, including but not limited to emotional distress, lost wages, and attorneys' fees and costs.

229.    Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his race.

230.    Defendant discriminated against Plaintiff because of his race by engaging in, tolerating, or failing to prevent discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff despite him informing them through multiple complaints, either internally as prescribed above or via the EEOC.

231.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages, including but benefits, promotion, and promotional opportunities, career opportunities, and costs, and is entitled to all available legal and equitable remedies.

30

232.    Plaintiff was humiliated, embarrassed and the Defendant's treatment and actions were ongoing throughout the period stated in this complaint.

233.    Plaintiff has incurred loss of reputation, and loss of career opportunities now and into the future, and all of the other losses stated without Plaintiff contributing in any way thereto.

234.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

235.    The wrongs done by the Defendant by aggravated by its willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages. Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendants from such conduct in similar situations.

236.    Defendant's actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey PLLC, to represent him in these proceedings.  Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

### COUNT TWO

**(Discrimination on the Basis of Sex in violation of Title VII, 42 U.S.C., § 2000e, *et. Seq.*)**

237.    Plaintiff incorporates all information and allegations made in Paragraphs 1-236 herein.

238.    Title VII, 42 U.S.C. §2000e, *inter alia*, protects employees from employment discrimination on the basis of sex.

239.    Defendants, by and through its agents and employees, intentionally engaged in the

aforementioned practices, policies, customs, and usages made unlawful by Title VII (42 U.S.C §§ 2000e, *et seq.*) subjected Plaintiff to disparate treatment because of his sex.

240.    Plaintiff was regarded by Defendant as being male since 2012.

241.    Plaintiff was a qualified individual for each position he held and applied for since October 2012.

242.    From January 2016 through April 2024, Defendant engaged in improper adverse actions materially affected the terms, privileges, and conditions of Plaintiff s employment as it hindered the Plaintiff from seeking a promotion, increased salary, and obtaining other related promotional opportunities that were instead given to others that were not the same sex as Plaintiff.

243.    Defendant also discriminated against Plaintiff by terminating him based on his sex as a man.

244.    Had Plaintiff been a woman, he would not have been forced to deal with the discriminatory conduct and been terminated.

245.    Because of his sex, Plaintiff was disparately treated and subjected to the unlawful conduct and adverse actions alleged throughout this Complaint, including his repeated non-selections and non-promotions, harassing comments directed at Plaintiff, fraudulent letters of counseling, and ultimately termination of Plaintiff.

246.    Defendant knew that Plaintiff is male prior to subjecting Plaintiff to the aforementioned material adverse employment actions, including terminating Plaintiff.

247.    The reasons proffered by Defendant for its unlawful conduct are pretextual, and Defendant cannot further offer any legitimate reason for its unlawful conduct.

248.    The Defendant has failed to provide an actionable basis as to why he was not

treated as favorably as other employees who did not share the same sex as Plaintiff. Defendant instead cherry picked their provided comparator evidence in their Position Statement and provided a pretextual explanation as to why he was terminated.

249.    Other employees, who did not share Plaintiff's sex, were treated more favorably than Plaintiff in terms and conditions of employment and Plaintiff's termination.

250.    As a direct and proximate result of the aforementioned acts that violated the Title VII, Plaintiff has suffered loss of wages, both in the past, present, and future, as well as compensatory damages, including but not limited to emotional distress, lost wages, and attorneys' fees and costs.

251.    Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his sex.

252.    Defendant discriminated against Plaintiff because of his sex by engaging in, tolerating, or failing to prevent discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff despite him informing them through multiple complaints, either internally as prescribed above or via the EEOC.

253.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages, including but benefits, promotion, and promotional opportunities, career opportunities, and costs, and is entitled to all available legal and equitable remedies.

254.    Plaintiff was humiliated, embarrassed and the Defendant's treatment and actions were ongoing throughout the period stated in this complaint.

255.    Plaintiff has incurred loss of reputation, and loss of career opportunities now and

into the future, and all of the other losses stated without Plaintiff contributing in any way thereto.

256.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

257.    The wrongs done by the Defendant were aggravated by their willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages.  Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendant from such conduct in similar situations.

258.    Defendant's actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey PLLC, to represent him in these proceedings.  Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

## COUNT THREE

**(Discrimination on the Basis of Disability in violation of ADA, 42 U.S.C. § 12101, *et. seq.*)**

259.    Plaintiff incorporates all information and allegations made in Paragraphs 1-258 herein.

260.    Defendant, by and through its agents and employees, intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by the ADA (42 U.S.C. §12101, et seq.) and terminated Plaintiff because of his disabilities or perceived disabilities.

261.    Plaintiff was regarded by Defendant as having mental and physical impairments.

262. Plaintiff was a qualified individual who had a disability, who was regarded by Defendant as having a disability at the time of termination, or who had a record of disability known to Defendant prior to Plaintiff's termination.

263. Defendant engaged in an adverse employment action against Plaintiff by terminating Plaintiff.

264. Defendant terminated Plaintiff because of Plaintiff's disability, perceived disability, or record of disability, any, or all, of which were known to Defendant at the time of Plaintiff's termination by the Defendant.

265. As a direct and proximate result of the aforementioned acts that violated the ADA, Plaintiff has suffered loss of wages, both in the past, present, and future, as well as compensatory damages, including but not limited to emotional distress.

266. Defendant's actions were intentional, willful, harsh, oppressive, reckless, and malicious, and as a further and proximate cause, Plaintiff has suffered severe emotional distress, pain, and suffering.  The wrongs done by the Defendant were aggravated by its willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages.  Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendant from such conduct in similar situations.

267. Defendant's actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey, PLLC. to represent him in these proceedings.  Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

## COUNT FOUR

**(Hostile Work Environment on the Basis of Race in violation of Title VII, 42 U.S.C., §**

**2000e, *et. Seq*.)**

268.     Plaintiff incorporates all information and allegations made in Paragraphs 1-267 herein.

269.     Title VII, 42 U.S.C. §2000e, *inter alia*, protects employees from hostile work environment employment discrimination on the basis of race.

270.     Defendants, by and through its agents and employees, intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by Title VII (42 U.S.C §§ 2000e, *et seq*.) subjected Plaintiff to a hostile work environment because of his race.

271.     Plaintiff was regarded by Defendant as being Black/African American since 2012.

272.     Plaintiff was a qualified individual for each position he held and applied for since October 2012.

273.     From January 2016 through April 2024, Defendant engaged in improper adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment as it hindered the Plaintiff from seeking a promotion, increased salary, and obtaining other related promotional opportunities that were instead given to others that were not the same race as Plaintiff.

274.     Because of his race, Plaintiff was subject to hostile work environment because of Plaintiff's race since January 2016 as he was subjected to harassing comments about Black people, repeated non-selections and non-promotions, and materially adverse disciplinary actions that are severe and pervasive enough to change the terms, conditions, and benefits of employment with Defendant including Plaintiff's termination.

36

275.    Defendant knew that Plaintiff is Black/African American prior to subjecting Plaintiff to the hostile work environment based on his race.

276.    The reasons proffered by Defendant for its unlawful conduct are pretextual, and Defendant cannot further offer any legitimate reason for its unlawful conduct.

277.    The Defendant has failed to provide an actionable basis as to why he was not treated as favorably as other employees who did not share the same race as Plaintiff. Defendant instead cherry picked their provided comparator evidence in their Position Statement and provided a pretextual explanation as to why Plaintiff was terminated.

278.    Other employees, who did not share Plaintiff's race, were treated more favorably than Plaintiff in terms and conditions of employment and Plaintiff's termination.

279.    As a direct and proximate result of the aforementioned acts that violated the Title VII, Plaintiff has suffered loss of wages, both in the past, present, and future, as well as compensatory damages, including but not limited to emotional distress, lost wages, and attorneys' fees and costs.

280.    Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his race.

281.    Defendant discriminated against Plaintiff because of his race by engaging in, tolerating, or failing to prevent discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff despite him informing them through multiple complaints, either internally as prescribed above or via the EEOC.

282.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary

damages, including but benefits, promotion, and promotional opportunities, career

opportunities, and costs, and is entitled to all available legal and equitable remedies.

283.    Plaintiff was humiliated, embarrassed and the Defendant's treatment and actions

were ongoing throughout the period stated in this complaint.

284.    Plaintiff has incurred loss of reputation, and loss of career opportunities now and

into the future, and all of the other losses stated without Plaintiff contributing in any way

thereto.

285.    Defendant is directly liable for the discriminatory acts or omissions of its agents,

servants and employees while acting within the course and scope of their employment,

under the theory of Respondeat Superior.

286.    The wrongs done by the Defendant were aggravated by their willfulness,

wantonness, and maliciousness for which the law allows the imposition of exemplary

damages.  Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the

trier of fact to serve as punishment to deter Defendant from such conduct in similar

situations.

287.    Defendant's actions as stated above, and the resulting damages to Plaintiff, have

necessitated that Plaintiff retain the services of Tully Rinckey PLLC, to represent him in

these proceedings.  Wherefore, Plaintiff seeks recovery of reasonable and necessary

attorneys' fees.

## COUNT FIVE

**(Discrimination on the basis of Age in violation of ADEA, 29 USC §621, *et seq*.)**

288.    Plaintiff incorporates all information and allegations made in Paragraphs 1-287

herein.

38

289.     ADEA, 29 USC §621, *inter alia*, protects employees from employment discrimination on the basis of age.

290.     Defendants, by and through its agents and employees, intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by ADEA (ADEA, 29 USC §621, *et seq.*) subjected Plaintiff to disparate treatment because of his age.

291.     Plaintiff was regarded by Defendant as being over the age of 40 years old since October 2012, as Defendant was aware the client was born in 1969.

292.     Plaintiff was a qualified individual for each position he held and applied for since October 2012.

293.     From January 2016 through April 2024, Defendant engaged in improper adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment as it hindered the Plaintiff from seeking a promotion, increased salary, obtaining other related promotional opportunities that were instead given to others that were younger than Plaintiff, and ultimately termination of Plaintiff.

294.     Defendant also discriminated against Plaintiff by terminating him on or about April 4, 2024, based on his age.

295.     Had Plaintiff been younger and under the age of forty years old, Plaintiff would not have been forced to deal with the discriminatory conduct and been terminated.

296.     Because of his age, Plaintiff was disparately treated and subjected to the unlawful conduct and adverse actions alleged throughout this Complaint, including his repeated non-selections and non-promotions, harassing comments directed at Plaintiff, fraudulent letters of counseling, and ultimately termination of Plaintiff.

297.     Defendant knew that Plaintiff is over the age of 40 years old prior to subjecting Plaintiff to the aforementioned material adverse employment actions.

298.     The reasons proffered by Defendant for its unlawful conduct are pretextual, and Defendant cannot further offer any legitimate reason for its unlawful conduct.

299.     The Defendant has failed to provide an actionable basis as to why he was not treated as favorably as other employees who were younger than Plaintiff. Defendant instead cherry picked their provided comparator evidence in their Position Statement and provided a pretextual explanation as to why Defendant terminated Plaintiff.

300.     Other employees, who were younger than Plaintiff, were treated more favorably than Plaintiff in terms and conditions of employment and Plaintiff's termination.

301.     As a direct and proximate result of the aforementioned acts that violated the ADEA, Plaintiff has suffered loss of wages, both in the past, present, and future, as well as compensatory damages, including but not limited to emotional distress, lost wages, and attorneys' fees and costs.

302.     Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his age.

303.     Defendant discriminated against Plaintiff because of his age by engaging in, tolerating, or failing to prevent discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff despite him informing them through multiple complaints, either internally as prescribed above or via the EEOC.

304.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary

damages, including but benefits, promotion, and promotional opportunities, career opportunities, and costs, and is entitled to all available legal and equitable remedies.

305.    Plaintiff was humiliated, embarrassed and the Defendant's treatment and actions were ongoing throughout the period stated in this complaint.

306.    Plaintiff has incurred loss of reputation, and loss of career opportunities now and into the future, and all of the other losses stated without Plaintiff contributing in any way thereto.

307.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

308.    The wrongs done by the Defendant were aggravated by their willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages.  Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendant from such conduct in similar situations.

309.    Defendant's actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey PLLC, to represent him in these proceedings.  Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

## COUNT SIX

**(Retaliation on the basis of Complaints of Race Discrimination in Violation of Title VII, 42 U.S.C., §2000, *et. Seq*.)**

310.    Plaintiff incorporates the allegations made in Paragraphs 1 through 309 herein.

311.    Title VII, 42 U.S.C. §2000e, *inter alia*, protects employees from adverse employment actions in retaliation for complaining about race, sex, and national origin discrimination.

312.    Defendant, by and through its agents and employees, engaged in the aforementioned practices, policies, customs, and usages made unlawful by 42 U.S.C. §2000e, *et seq.*

313.    Plaintiff complained to management officials like Mr. Parvin, Ms. Pitts, Mr. Thistle, Mr. Burt, and Ms. Leatherberry and human resources managers like Ms. Jackson on multiple occasions from January 2016 through April 2024 about the harassment, racist comments, non-promotions, fraudulent letters of counseling, and otherwise disparate adverse actions against Plaintiff.

314.    Plaintiff's employment was subjected to a pattern of repeated harassing comments, non-selections, non-promotions, fraudulent, letters of counseling, and ultimately termination in retaliation for Plaintiff's complaints of discrimination on the basis of race.

315.    Had Plaintiff not complained of the discrimination based on race, Defendant would not have subjected Plaintiff to a pattern of repeated non-selections and non-promotions.

316.    As a direct and proximate result of the Defendant's conduct that violated 42 U.S.C. §2000e, *et seq.*, Plaintiff suffered damages, including lost wages, emotional distress, and attorneys' fees and costs.

317.    Defendant's actions were intentional, willful, harsh, oppressive, reckless, and malicious, and as a further and proximate cause, Plaintiff has suffered severe emotional

distress, pain, and suffering.  The wrongs done by the Defendant were aggravated by their willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages.  Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendant from such conduct in similar situations.

318.    Defendant's actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey, PLLC, to represent him in these proceedings. Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

## COUNT SEVEN

### (Retaliation on the basis of Complaints of Age Discrimination in Violation of in violation of ADEA, 29 USC §621, *et seq.*)

319.    Plaintiff incorporates the allegations made in Paragraphs 1 through 318 herein.

320.    ADEA, 29 USC §621, *inter alia*, protects employees from adverse employment actions in retaliation for complaining about age discrimination.

321.    Defendant, by and through its agents and employees, engaged in the aforementioned practices, policies, customs, and usages made unlawful by 29 USC §621, *et seq*.

322.    Plaintiff's employment was subjected to a pattern of repeated harassing comments, non-selections, non-promotions, fraudulent, letters of counseling, and ultimately termination in retaliation for Plaintiff's complaints of discrimination on the basis of age.

323.    Plaintiff complained to management officials like Mr. Parvin, Ms. Pitts, Mr. Thistle, Mr. Burt, and Ms. Leatherberry and human resources managers like Ms. Jackson

on multiple occasions from January 2016 through April 2024 about the harassing comments, non-promotions, fraudulent letters of counseling, and otherwise disparate adverse actions against Plaintiff.

324.     Had Plaintiff not complained of the discrimination based on age, Defendant would not have subjected Plaintiff to a pattern of repeated non-selections, non-promotions, harassment, fraudulent letters of counseling, and ultimately termination.

325.     As a direct and proximate result of the Defendant's conduct that violated 29 USC §621, *et seq*., Plaintiff suffered damages, including lost wages, emotional distress, and attorneys' fees and costs.

326.     Defendant's actions were intentional, willful, harsh, oppressive, reckless, and malicious, and as a further and proximate cause, Plaintiff has suffered severe emotional distress, pain, and suffering.  The wrongs done by the Defendant were aggravated by their willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages.  Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendant from such conduct in similar situations.

327.     Defendant's actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey, PLLC, to represent him in these proceedings. Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

## COUNT EIGHT

**(Retaliation on the basis of Complaints of Disability Discrimination and Requests for Accommodation in Violation of in violation of ADA, 42 U.S.C. § 12101, *et seq*.)**

328.    Plaintiff incorporates the allegations made in Paragraphs 1 through 328 herein.

329.    ADA, 42 U.S.C. § 12101, *inter alia*, protects employees from adverse employment actions in retaliation for complaining about age discrimination.

330.    Defendant, by and through its agents and employees, engaged in the aforementioned practices, policies, customs, and usages made unlawful by 42 U.S.C. § 12101, *et seq.*

331.    Plaintiff had put Defendant on constructive notice for his disabilities including PTSD, anxiety disorder, and depression as early as October 2012 when Plaintiff was first hired.

332.    Plaintiff further notified Defendant of his disability of pulmonary sarcoidosis on or about March 14, 2024, when Plaintiff notified Defendant of a doctor's appointment to address the condition and the brain fog that the condition was causing Plaintiff.

333.    Plaintiff was a qualified individual who had a disability, who was regarded by Defendant as having a disability at the time of termination, or who had a record of disability known to Defendant prior to Plaintiff's termination.

334.    Plaintiff participated in protected activity by complaining about disability discrimination and notifying Defendant of his disabilities and requesting accommodation as recently as March 2024 for his disabilities.

335.    Plaintiff complained to management officials like Mr. Parvin, Ms. Pitts, Mr. Thistle, Mr. Burt, and Ms. Leatherberry and human resources managers like Ms. Jackson on multiple occasions from January 2016 through April 2024 about the harassing comments, non-promotions, fraudulent letters of counseling, and otherwise disparate adverse actions against Plaintiff.

336.     Defendant engaged in an adverse employment action against Plaintiff by terminating Plaintiff.

337.     Plaintiff's employment was subjected to termination in retaliation for Plaintiff's complaints of discrimination on the basis of disability.

338.     Had Plaintiff not complained of the discrimination based on disability, notified Defendant of his disabilities, or requested accommodations for his disabilities, Defendant would not have subjected Plaintiff to non-selections, non-promotions, fraudulent letters of counseling, and termination.

339.     As a direct and proximate result of the Defendant's conduct that violated by 42 U.S.C. § 12101, *et seq.*, Plaintiff suffered damages, including lost wages, emotional distress, and attorneys' fees and costs.

340.     Defendant's actions were intentional, willful, harsh, oppressive, reckless, and malicious, and as a further and proximate cause, Plaintiff has suffered severe emotional distress, pain, and suffering.  The wrongs done by the Defendant were aggravated by their willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages.  Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendant from such conduct in similar situations.

341.     Defendant's actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey, PLLC, to represent him in these proceedings. Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

### COUNT NINE

**(Hostile Work Environment on the Basis of Sex in violation of Title VII, 42 U.S.C., § 2000e,**

***et. Seq.*)**

342.   Plaintiff incorporates all information and allegations made in Paragraphs 1-341 herein.

343.   Title VII, 42 U.S.C. §2000e, *inter alia*, protects employees from hostile work environment employment discrimination on the basis of sex.

344.   Defendant, by and through its agents and employees, intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by Title VII (42 U.S.C §§ 2000e, *et seq*.) subjected Plaintiff to a hostile work environment because of his race.

345.   Plaintiff was regarded by Defendant as being male since October 2012.

346.   Plaintiff was a qualified individual for each position he held and applied for since October 2012.

347.   From January 2016 through April 2024, Defendant has engaged in improper adverse actions materially affected the terms, privileges, and conditions of Plaintiff s employment as it hindered the Plaintiff from seeking a promotion, increased salary, obtaining other related promotional opportunities that were instead given to others that were not the same sex as Plaintiff, and ultimately termination of Plaintiff.

348.   Because of his sex, Plaintiff was subject to hostile work environment because of Plaintiff's race from January 2016 through April 2024 as he was subjected to harassing comments about men, repeated non-selections and non-promotions, and materially adverse disciplinary actions that are severe and pervasive enough to change the terms, conditions, and benefits of employment with Defendant.

349.    Defendant knew that Plaintiff is male prior to subjecting Plaintiff to the hostile work environment based on his sex.

350.    The reasons proffered by Defendant for its unlawful conduct are pretextual, and Defendant cannot further offer any legitimate reason for its unlawful conduct.

351.    The Defendant has failed to provide an actionable basis as to why he was not treated as favorably as other employees who did not share the same sex as Plaintiff. Defendant instead cherry picked their provided comparator evidence in their Position Statement and provided a pretextual reason for Plaintiff's termination.

352.    Other employees, who did not share Plaintiff's sex, were treated more favorably than Plaintiff in terms and conditions of employment.

353.    As a direct and proximate result of the aforementioned acts that violated the Title VII, Plaintiff has suffered loss of wages, both in the past, present, and future, as well as compensatory damages, including but not limited to emotional distress, lost wages, and attorneys' fees and costs.

354.    Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his race.

355.    Defendant discriminated against Plaintiff because of his sex by engaging in, tolerating, or failing to prevent discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff despite him informing them through multiple complaints, either internally as prescribed above or via the EEOC.

356.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary

48

damages, including but benefits, promotion, and promotional opportunities, career opportunities, and costs, and is entitled to all available legal and equitable remedies.

357.     Plaintiff was humiliated, embarrassed and the Defendant's treatment and actions were ongoing throughout the period stated in this complaint.

358.     Plaintiff has incurred loss of reputation, and loss of career opportunities now and into the future, and all of the other losses stated without Plaintiff contributing in any way thereto.

359.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

360.     The wrongs done by the Defendant were aggravated by their willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages.  Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendant from such conduct in similar situations.

361.     Defendant's actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey PLLC, to represent him in these proceedings.  Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

## COUNT TEN

**(Hostile Work Environment on the Basis of Disability in violation of ADA, 42 U.S.C., § 12101, *et. Seq.*)**

362.     Plaintiff incorporates all information and allegations made in Paragraphs 1-361

49

herein.

363.    ADA, 42 U.S.C., § 12101, *inter alia*, protects employees from hostile work environment employment discrimination on the basis of disability.

364.    Defendant, by and through its agents and employees, intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by ADA (42 U.S.C., § 12101, et seq.) subjected Plaintiff to a hostile work environment because of his race.

365.    Plaintiff was regarded by Defendant as having disabilities as early as October 2012.

366.    Plaintiff was a qualified individual for each position he held and applied for since October 2012.

367.    From January 2016 through April 2024, Defendant has engaged in improper adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment as it hindered the Plaintiff from seeking a promotion, increased salary, obtaining other related promotional opportunities that were instead given to others that did not have a disability, and ultimately termination of Plaintiff.

368.    Because of his disabilities, Plaintiff was subject to hostile work environment because of Plaintiff's disabilities from January 2016 through April 2024 as he was subjected to harassing comments about his disabilities, repeated non-selections and non-promotions, and materially adverse disciplinary actions that are severe and pervasive enough to change the terms, conditions, and benefits of employment with Defendant.

369.    Defendant knew or should have known that Plaintiff had a disability prior to subjecting Plaintiff to the hostile work environment based on his disabilities.

370.    The reasons proffered by Defendant for its unlawful conduct are pretextual, and

50

Defendant cannot further offer any legitimate reason for its unlawful conduct.

371.    The Defendant has failed to provide an actionable basis as to why he was not treated as favorably as other employees who did not share the same race as Plaintiff. Defendant instead cherry picked their provided comparator evidence in their Position Statement and only provided a pretextual explanation as to why Defendant terminated Plaintiff.

372.    Other employees, who did not have a disability, were treated more favorably than Plaintiff in terms and conditions of employment.

373.    As a direct and proximate result of the aforementioned acts that violated the ADA, Plaintiff has suffered loss of wages, both in the past, present, and future, as well as compensatory damages, including but not limited to emotional distress, lost wages, and attorneys' fees and costs.

374.    Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his disabilities.

375.    Defendant discriminated against Plaintiff because of his disabilities by engaging in, tolerating, or failing to prevent discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff despite him informing them through multiple complaints, either internally as prescribed above or via the EEOC.

376.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages, including but benefits, promotion, and promotional opportunities, career opportunities, and costs, and is entitled to all available legal and equitable remedies.

51

377.     Plaintiff was humiliated, embarrassed and the Defendant's treatment and actions were ongoing throughout the period stated in this complaint.

378.     Plaintiff has incurred loss of reputation, and loss of career opportunities now and into the future, and all of the other losses stated without Plaintiff contributing in any way thereto.

379.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

380.     The wrongs done by the Defendant were aggravated by their willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages.  Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendant from such conduct in similar situations.

381.     Defendant's actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey PLLC, to represent him in these proceedings.  Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

## COUNT ELEVEN

**(Retaliation on the basis of Complaints of Sex Discrimination in Violation of Title VII, 42 U.S.C., §2000, *et. Seq*.)**

382.     Plaintiff incorporates the allegations made in Paragraphs 1 through 381 herein.

383.     Title VII, 42 U.S.C. §2000e, *inter alia*, protects employees from adverse employment actions in retaliation for complaining about race, sex, and national origin

discrimination.

384. Defendant, by and through its agents and employees, engaged in the aforementioned practices, policies, customs, and usages made unlawful by 42 U.S.C. §2000e, *et seq*.

385. Plaintiff complained to management officials like Mr. Parvin, Ms. Pitts, Mr. Thistle, Mr. Burt, and Ms. Leatherberry and human resources managers like Ms. Jackson on multiple occasions from January 2016 through April 2024 about the harassing comments, non-promotions, fraudulent letters of counseling, and otherwise disparate adverse actions against Plaintiff.

386. Plaintiff's employment was subjected to a pattern of repeated non-selections, non-promotions, and ultimately termination in retaliation for Plaintiff's complaints of discrimination on the basis of sex.

387. Had Plaintiff not complained of the discrimination based on sex, Defendant would not have subjected Plaintiff to a pattern of repeated non-selections and non-promotions.

388. As a direct and proximate result of the Defendants' conduct that violated 42 U.S.C. §2000e, *et seq*., Plaintiff suffered damages, including lost wages, emotional distress, and attorneys' fees and costs.

389. Defendants' actions were intentional, willful, harsh, oppressive, reckless, and malicious, and as a further and proximate cause, Plaintiff has suffered severe emotional distress, pain, and suffering. The wrongs done by the Defendants were aggravated by their willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages. Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendants from such

conduct in similar situations.

390.     Defendants' actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey, PLLC, to represent him in these proceedings. Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

## COUNT TWELVE

**(Retaliation on the basis of Complaints of Race Discrimination in Violation of CRA §1981, 42 U.S.C., §1981, *et. Seq*.)**

391.     Plaintiff incorporates the allegations made in Paragraphs 1 through 390 herein.

392.     CRA §1981, 42 U.S.C., §1981, *et. Seq.*, *inter alia*, protects employees from adverse employment actions in retaliation for complaining about race discrimination.

393.     Defendant, by and through its agents and employees, engaged in the aforementioned practices, policies, customs, and usages made unlawful by 42 U.S.C., §1981, *et. Seq.*

394.     Plaintiff complained to management officials like Mr. Parvin, Ms. Pitts, Mr. Thistle, Mr. Burt, and Ms. Leatherberry and human resources managers like Ms. Jackson on multiple occasions from January 2016 through April 2024 about the harassing comments, non-promotions, fraudulent letters of counseling, and otherwise disparate adverse actions against Plaintiff.

395.     Plaintiff's employment was subjected to a pattern of repeated non-selections and non-promotions in retaliation for Plaintiff's complaints of discrimination on the basis of race.

396.     Had Plaintiff not complained of the discrimination based on race, Defendant would

not have subjected Plaintiff to a pattern of repeated non-selections and non-promotions.

397.    As a direct and proximate result of the Defendant's conduct that violated 42 U.S.C., §1981, et. Seq, *et seq.*, Plaintiff suffered damages, including lost wages, emotional distress, and attorneys' fees and costs.

398.    Defendant's actions were intentional, willful, harsh, oppressive, reckless, and malicious, and as a further and proximate cause, Plaintiff has suffered severe emotional distress, pain, and suffering.  The wrongs done by the Defendant were aggravated by their willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages.  Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendant from such conduct in similar situations.

399.    Defendant's actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey, PLLC, to represent him in these proceedings. Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

## COUNT THIRTEEN

**(Discrimination on the Basis of Race in violation of CRA §1981, 42 U.S.C., §1981, *et seq.*)**

400.    Plaintiff incorporates all information and allegations made in Paragraphs 1-399 herein.

401.    CRA §1981, 42 U.S.C., §1981, *inter alia*, protects employees from employment discrimination on the basis of race.

402.    Defendants, by and through its agents and employees, intentionally engaged in the aforementioned practices, policies, customs, and usages made unlawful by CRA §1981 (42

55

U.S.C., §1981, *et seq.*) subjected Plaintiff to disparate treatment because of his race.

403.    Plaintiff was regarded by Defendant as being Black/African American since 2012.

404.    Plaintiff was a qualified individual for each position he held and applied for since October 2012.

405.    From January 2016 through April 2024, Defendant has engaged in improper adverse actions materially affected the terms, privileges, and conditions of Plaintiff s employment as it hindered the Plaintiff from seeking a promotion, increased salary, obtaining other related promotional opportunities that were instead given to others that were not the same race as Plaintiff, and ultimately termination of Plaintiff.

406.    Because of his race, Plaintiff was disparately treated and subjected to the unlawful conduct and adverse actions alleged throughout this Complaint, including his repeated non-selections and non-promotions, racist and harassing comments directed at Plaintiff, fraudulent letters of counseling, and Plaintiff's termination.

407.    Defendant knew that Plaintiff is Black/African American prior to subjecting Plaintiff to the aforementioned material adverse employment actions.

408.    The reasons proffered by Defendant for its unlawful conduct are pretextual, and Defendant cannot further offer any legitimate reason for its unlawful conduct.

409.    The Defendant has failed to provide an actionable basis as to why he was not treated as favorably as other employees who did not share the same race as Plaintiff. Defendant instead cherry picked their provided comparator evidence in their Position Statement and provided a pretextual reason as to why Defendant terminated Plaintiff.

410.    Other employees, who did not share Plaintiff's race, were treated more favorably than Plaintiff in terms and conditions of employment.

411.    As a direct and proximate result of the aforementioned acts that violated the CRA §1981, Plaintiff has suffered loss of wages, both in the past, present, and future, as well as compensatory damages, including but not limited to emotional distress, lost wages, and attorneys' fees and costs.

412.    Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his race.

413.    Defendant discriminated against Plaintiff because of his race by engaging in, tolerating, or failing to prevent discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff despite him informing them through multiple complaints, either internally as prescribed above or via the EEOC.

414.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages, including but not limited to benefits, promotion, and promotional opportunities, career opportunities, and costs, and is entitled to all available legal and equitable remedies.

415.    Plaintiff was humiliated, embarrassed and the Defendant's treatment and actions were ongoing throughout the period stated in this complaint.

416.    Plaintiff has incurred loss of reputation, and loss of career opportunities now and into the future, and all of the other losses stated without Plaintiff contributing in any way thereto.

417.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

418.     The wrongs done by the Defendant were aggravated by their willfulness, wantonness, and maliciousness for which the law allows the imposition of exemplary damages.  Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendant from such conduct in similar situations.

419.     Defendant's actions as stated above, and the resulting damages to Plaintiff, have necessitated that Plaintiff retain the services of Tully Rinckey PLLC, to represent him in these proceedings.  Wherefore, Plaintiff seeks recovery of reasonable and necessary attorneys' fees.

## COUNT FOURTEEN:

## (Hostile Work Environment and Intimidation in Violation of ADEA UNDER 29 USC §621, *et seq*.)

420.     Plaintiff incorporates all information and allegations made in Paragraphs 1-419 herein.

421.     Plaintiff was routinely humiliated by management for Defendant, who subjected him to a harassing and hostile and offensive work environment that interfered with his work performance and became increasingly severe and pervasive as set forth herein, which created a hostile, offensive and abusive workplace environment and his termination in violation of the ADEA.

422.     Plaintiff was subjected to a hostile work environment based on his claims of age-based harassment, including when he was subjected to harassing comments about whether Plaintiff belonged and ultimately terminating Plaintiff. Lastly, Plaintiff received a termination letter shortly after taking Leave due to his disabilities. Defendant's failure to

investigate and address, and for reporting such activities as part of reprisal which Defendants unreasonably interfered with, by affecting a term, condition, or privilege of his employment by creating different employment conditions, and subjecting him to an investigation, ultimately leading to his termination.

423.    Defendant knew or should have known of the harassment, yet Defendant ignored the harassment and/or failed to adequately investigate the harassment and conditions of employment, and took no effective, immediate, or remedial action.

424.    Because of Plaintiff's complaints, the harassment and intimidating environment continued unabated and increased over time leading to negative merits in Plaintiff's performance evaluation which had never occurred, a performance improvement plan, and finally, a termination.

425.    By failing to take appropriate and effective remedial action against Plaintiff's supervisors and manager, Defendant acted with malice or with reckless or callous indifference to his complaints.

426.    As a direct and proximate result of the conduct by Defendant, Plaintiff suffered injury including, but not limited to, termination, denial of promotion, loss of wages, job assignments, retirement savings, time in service with the Department, and other benefits of employment, and incurred pain and suffering including emotional stress and uncertainty surrounding his termination.

427.    Plaintiff was made to endure a great amount of pain and suffering, and Defendant's treatment and actions including creating the pretext to terminate Plaintiff and punish him for trying to enforce his rights.

428.    Defendant created a hostile and intimidating work environment because of

Plaintiff's complaint regarding age-based harassment and engaged in retaliation when he tried to exercise his protected rights.

429.    Plaintiff incurred compensatory damages, lost wages, lost job benefits, loss of reputation, and loss of career opportunities now and into the future, and all of the other losses stated without Plaintiff contributing in any way thereto.

## COUNT FIFTEEN:

### (Retaliation under 38 U.S.C. § 4311(b))

430.    Plaintiff realleges and incorporates the allegations of Paragraphs 1 through 429 of this complaint as if set forth fully herein.

431.    USERRA prohibits retaliation for having taken an action to enforce a protection afforded an individual under USERRA or for having exercised a right provided for under USERRA.    Specifically, 38 U.S.C. §4311(b) provides that an employer may not discriminate in employment or take any adverse employment action against any person regardless of whether they have performed service in the uniformed service.

432.    After learning of Plaintiff's military service and his veteran benefits, Defendant repeatedly denied Plaintiff promotions and raises from 2018 through 2021 and ultimately terminated Plaintiff in retaliation of Plaintiff's military service.

433.    Plaintiff, from 2018 through 2021, was well-qualified for promotions and raises, but never received them as Defendant selected less qualified employees each time.

434.    Responsible selecting officials for the promotions and raises, including direct supervisor Mr. Palmer, made derogatory remarks about Plaintiff's military service (including "Why do you need a raise or promotion when you're already getting retirement and disability pay from your military service?"), indicating a retaliatory animus against

60

providing Plaintiff with raises and promotions due to Plaintiff's military service and benefits.

435.    Defendant retaliated against Plaintiff for Plaintiff's military service by participating and/or being complicit in a pattern to deny Plaintiff of promotions, benefits, and pay raises and ultimately terminating him.

436.    Plaintiff 's military service was a motivating factor in the retaliation against Plaintiff by Defendant, as indicated by Defendant's management officials stating remarks like, "Why do you need a raise or promotion when you're already getting retirement and disability pay from your military service?"

437.    As a direct and proximate cause of the actions of Defendant, Plaintiff has suffered injury including but not limited to denial of promotion, loss of wages, job assignments, retirement savings, time in service, benefits of employment, and has incurred pain and suffering from the stress and uncertainty surrounding his denial of benefits, pay raises, promotion, and performance awards.

### COUNT SIXTEEN:

### (Denial of Benefits of Employment under USERRA, 38 U.S.C. § 4311(a))

438.    Plaintiff realleges and incorporates the allegations of Paragraphs 1 through 437 of this complaint as is set forth fully herein.

439.    USERRA provides that a person who performs military service shall not be denied any benefit of employment on the basis of that service. The term "benefit of employment" is quite broad and, as it is defined at 38 U.S.C. § 4303(2), refers to "any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan

or practice."

440. Defendant created an environment in which it was clear Plaintiff 's veteran status was unwelcome and a detriment to his career for Defendant.

441. Defendant made inappropriate, hostile comments to Plaintiff about his military service that exceeded the standards of a tolerable workplace environment and ultimately terminated Plaintiff as a result of his military service.

442. The opportunity of an employee in Defendants to perform his duties and responsibilities in a workplace environment free from hostility, free from animus towards military service, is a "benefit of employment" as that term is broadly defined under 38 U.S.C. §4303(2).

443. Defendant denied Plaintiff benefits of employment when they denied his request for leave, denied performance awards, promotions, and pay raises which permitted the existence of a hostile work environment against Plaintiff motivated by his military service.

444. Defendant denied Plaintiff benefits of employment when inappropriate, hostile comments were made to Plaintiff directly and indirectly about his military service.

445. Plaintiff's military service was a motivating factor in the actions taken by Defendant.

446. As a direct and proximate result of the continuous, harassing behavior of Defendant, Plaintiff has suffered injury including but not limited to denial of promotion, loss of wages, job assignments, retirement savings, time in service, benefits of employment, and has incurred pain and suffering from the stress and uncertainty surrounding his denial of benefits, pay raises, promotion, and performance awards.

**COUNT SEVENTEEN:**

**(Discrimination Under USERRA, 38 U.S.C. §§ 4301 et seq.)**

447.    Plaintiff incorporates the allegations made in Paragraphs 1 through 446 herein.

448.    USERRA is a Federal law intended to ensure that persons who serve or have served in the Armed Forces, Reserve, National Guard, Air Force, or other Uniformed Services: (1) are not disadvantaged in their civilian careers because of their service; (2) are promptly reemployed in their civilian jobs upon their return from duty; and (3) are not discriminated against in employment based on past, present, or future military service. The law is intended to encourage non-career uniformed service so the United States can enjoy the protection of those services, staffed by qualified people, while maintaining a balance with the needs of private and public employers who also depend on these same individuals.

449.    USERRA prohibits discrimination against individuals on the basis of their participation in the uniformed services. 38 U.S.C. § 4301(a)(3). USERRA also prohibits discrimination and reprisal against members of the uniformed services, to include but not limited to, "retention in employment, promotion, or any benefit of employment by an employer on the basis of that member." 38 U.S.C. § 4311(a).

450.    USERRA protections apply to all past or current members of the Armed Services, to include those persons who apply to be a member of any of the branches of the uniformed services. 38 U.S.C. § 4311(a). The protections afforded to an individual are broad and apply to most areas of employment, include hiring, promotion, termination, and benefits. Id. USERRA specifically prohibits an employer from taking adverse actions against any employee because that employee has taken an action to enforce a protection afforded to them under USERRA. 38 U.S.C. § 4311(b).

451.    Further, an employer will be considered to have engaged in prohibited action if the

employee's membership, service, or obligation for service in the uniformed services is a motivating factor in the employer's action. 38 U.S.C. § 4311(c)(1). As articulated in the United States District Courts' jury instructions, the term "motivating factor" means that, if the employer was asked at the moment of the decision what their reasons were and they gave a truthful response, one of those reasons would be the employee's military position or military obligations. Thus, if membership in a Uniformed Service made any difference in an employer's decision, then it can be found to be motivating factor in that decision.

452.    Discriminatory motivation on the basis of military status, in violation of USERRA, may be reasonably inferred from a variety of other factors, including: proximity in time between the military activity and the adverse employment action; inconsistencies between the proffered reason and other actions by the employer; an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity; and disparate treatment of certain employees compared to other employees with similar work records or duties. *See Blais v. Bridgewell, Inc.*, No. 11–10100–DJC, 2012 WL 2577566, at \*6 (D.Mass. July 3, 2012) (quoting *Conners v. Billerica Police Dep't.*, 679 F.Supp.2d 218, 226 (D.Mass.2010)).

453.    USERRA protections include a servicemember entitled to the employment rights and benefits of those who have not served in the Armed Forces. These rights include being placed in the same position of employment as if the person's employment was not interrupted by military service, the same position in which the person was employed on the date of the commencement of service, a position of like seniority, a position of similar status and pay, and a position whose duties of which the person is qualified to perform. 38 U.S.C. § 4313.

64

454.    Here, Defendant was on or should have been on notice of Plaintiff's Military service.

455.    Further, Defendants were aware of Plaintiff's approved veteran compensation.

456.    Plaintiff received his termination letter immediately following his disclosure of veteran compensation associated with his military-related medical condition.

457.    Plaintiff was harassed, questioned, mistreated, and suffered unequal treatment compared to his co-workers, who did not experience the same or similar harassment.

458.    The prevailing purpose of USERRA is to encourage non-career military service, minimize disruption based on such service, and prevent discrimination against service members. *See* 38 U.S.C. § 4301. The United States Supreme Court has repeatedly recognized that USERRA is "to be liberally construed for the benefit of those who left private life to serve their country." *See, Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285 (1946). As such, USERRA prohibits discrimination and reprisal against members of the uniformed service.

459.    USERRA § 4311(a) states that "a person who is a member of… uniformed service shall not be denied…retention in employment…or any benefit of employment by an employer on the basis of that membership…" The term "benefit of employment" is quite broad and includes a service member's right to freedom from harassment and a hostile work environment. See, 38 U.S.C. § 4303(2). …" The statute goes on to state that, "[a]n employer shall be considered to have engaged in actions prohibited…under subsection (a), if the person's membership,…service,…or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership,…service,…or obligation

for service." § 4311(c)(1).  As such, once an employee shows that his military service was a "motivating factor" in denials of promotion, pay raises, benefits, and performance awards, the employer bears the burden of proving that it would have terminated the employee's position in the absence of the employee's service.

460.    Defendants violated USERRA § 4311(a) when he was repeatedly harassed with unprofessional and discriminatory comments, denied promotions, and ultimately terminated by Defendant. Defendant's failure to investigate and address, and for reporting such activities as part of reprisal which Defendant unreasonably interfered with, by affecting a term, condition, or privilege of his employment by creating different employment conditions, and subjecting him to an investigation, ultimately leading to his termination.

461.    The close proximity between the date that Plaintiff notified of his veteran compensation and the date that he was terminated makes it clear that Plaintiff's military status was a motivating factor in Defendants' decision to deny and terminate Plaintiff. *See, Maxfield v. Cintas Corp. No. 2*, 427 F.3d. 544, 552 (8th Cir. 2005); *Hance v. Norfolk Southern Ry. Co.*, 571 F.3d. 511 (6th Cir. 2009) (Employer's liability was based in part on plaintiff's termination upon return from two-week training).

462.    Defendant will not be able to prove that it would have denied Plaintiff performance awards, promotions, benefits, and pay raises to Plaintiff in the absence of Plaintiff's service.

463.    Defendant further violated USERRA by subjecting Plaintiff to constant harassment and discrimination due to his uniformed service and the benefits Plaintiff received because of his uniformed service. *Hance v. Norfolk Southern Ry. Co.*, 571 F.3d 511, 518 (6th Cir.

2009). Again, Defendant including direct supervisor Mr. Palmer, made derogatory remarks about Plaintiff's military service (including "Why do you need a raise or promotion when you're already getting retirement and disability pay from your military service?") while denying Plaintiff promotions and raises, indicating a discriminatory and retaliatory animus against providing Plaintiff with raises and promotions due to Plaintiff's military service and benefits..

464.    38 U.S.C. §4311(a) provides that an employee may not be denied a promotion because of the employee's membership in the uniformed service.

465.    Defendant discriminated against Plaintiff in violation of USERRA when they utilized absences from work due to military service in the United States Air Force for disciplinary purposes and was the basis for the conspiracy to discriminate against Plaintiff.

466.    Plaintiff's military service was a motivating factor in the actions taken by Defendants.

467.    The actions of Defendant were intentional, and under the Dole Act, Plaintiff qualifies for the enhancement provision where he may demand payment of double damages as liquidated damages or, in the alternative, the mandatory, statutory minimum of liquidated damages of $50,000 for the international and deliberately egregious violations of USERRA that were willful, intentional and without any credible legitimate purpose.

468.    As a direct and proximate result of the conduct by Defendant, Plaintiff has suffered injury including but not limited to denial of promotion, loss of wages, job assignments, retirement savings, time in service, benefits of employment, and has incurred pain and suffering from the stress and uncertainty surrounding his termination and denial of benefits, pay raises, promotion, and performance awards.

## COUNT EIGHTTEEN

### (Retaliation under 29 U.S.C.A. § 2601, et seq.)

469.     Plaintiff realleges and incorporates the allegations of Paragraphs 1 through 468 of this complaint as if set forth fully herein.

470.     FMLA prohibits retaliation for having taken an action to enforce a protection afforded an individual under FMLA or for having exercised a right provided for under FMLA. *See* 29 U.S.C. § 2614-2615. To succeed on FMLA retaliation claim by circumstantial evidence, it is plaintiff's burden to establish that (1) he invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment decision, and (3) the adverse action was causally related to his invocation of rights. *See* 29 U.S.C. § 2601 et seq.

471.     Plaintiff is a protected employee under FMLA.

472.     Plaintiff invoked his right to FMLA- qualifying leave when he requested time off for himself to take care of his medical conditions and disabilities from 2019 through November 2023.

473.     Defendant took adverse actions against Plaintiff by denying Plaintiff promotions and raises and ultimately terminating Plaintiff within five months of Plaintiff's most recent request for time off to deal with the medical issues.

474.     Multiple management officials, including Mr. Palmer, criticized Plaintiff for his use of FMLA from 2019 through 2021, including accusing Plaintiff multiple times of not being authorized to use FMLA even after Plaintiff received the correct authorization.

475.     The harassing statements by managements officials to Plaintiff about Plaintiff's use of FMLA illustrate a retaliatory animus against Plaintiff for his use of FMLA.

476.     Defendant retaliated against Plaintiff for Plaintiff's use of medical leave by

terminating Plaintiff on or about April 4, 2024.

477.    Plaintiff's request for medical leave was a motivating factor in the retaliation against Plaintiff by Defendant.

478.    As a direct and proximate cause of the actions Defendant, Plaintiff has suffered injury including but not limited to denial of benefits, pay raises, promotion, and performance awards, loss of wages, job assignments, retirement savings, time in service, benefits of employment, and has incurred pain and suffering from the stress and uncertainty surrounding his denial of benefits, pay raises, promotion, and performance awards.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

a. Award monetary damages and equitable relief for all harm Plaintiff has sustained as a result of Defendant's unlawful conduct, including for lost job benefits, lost of promotional opportunities he would have received but for Defendant's unlawful conduct;

b. Award equitable, declaratory, punitive, and injunctive relief; and

c. Award such other and further relief as this Honorable Court deems just and proper.

## VII.    JURY DEMAND

Plaintiff demands a trial by jury on all issues set forth herein pursuant to Fed. R. Civ. P. 38.

Respectfully Submitted,

*/s/Sean Timmons*
Sean Timmons, Esq.
Texas Bar No. 24067908
Tully Rinckey PLLC

69

18722 University Blvd Ste. 235,
Sugar Land, TX 77479
Tel. (832) 241-5888
stimmons@tullylegal.com

*/s/Nathan Simmons*
Nathan Simmons, Esq.
*PRO HAC VICE APPLICATION PENDING*
State Bar No. 24128701
Tully Rinckey, PLLC.
3420 Executive Center Drive, Suite 160
Austin, Texas 78731
nsimmons@fedattorney.com
(512) 225-2825

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 20, 2026, a true and correct copy of the forgoing has been served on all persons identified in the docket via ECF/CM:

Defendant Lockheed Martin:

Micah R Prude
Holland & Knight LLP - Dallas
1722 Routh Street, Suite 1500
Dallas, TX 75201-2533
214-969-1698
Fax: 214-969-1751
Email: micah.prude@hklaw.com

Anthony J Campiti
Holland & Knight LLP - Dallas
1722 Routh Street, Suite 1500
Dallas, TX 75201-2533
214/969-1565
Fax: 12149691751
Email: tony.campiti@hklaw.com

**Respectfully submitted,**

***/s/Nathan Simmons***
Nathan Simmons
Associate, Tully Rinckey PLLC
Texas Bar No.: 24128701
3724 Executive Center Drive Suite 205
Austin TX 78731
PH: (512) 225-2825
FAX: (512) 225-2801
nsimmons@fedattorney.com

71